USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/15/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

— v.—

SHIRLEY CALCANO

        Defendant.

**MEMORANDUM
OPINION & ORDER**

S17 98 Cr. 438 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This matter is before the Court on the Second Circuit's remand pursuant to United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) (Dkt. No. 343) and defense counsel's request for resentencing (Def. Ltr. Jan. 16, 2013). Defendant Shirley Calcano was sentenced to 480 months – 40 years' imprisonment – and four years' supervised release after a jury convicted her of engaging in a violent crime in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3), and narcotics conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). For the reasons set forth below, the Court concludes that a non-trivially different sentence would have been imposed had the Guidelines been advisory at the time Calcano was sentenced. Accordingly, Calcano's motion for resentencing is granted.

## BACKGROUND

        On June 15, 1998, a grand jury returned an indictment against Calcano and others arising out of their activities as members of a criminal enterprise known as the 165th Street Organization ("the Organization"). (United States v. Ramirez, S1 98 Cr. 438 (Dkt. No. 13)) The Organization, which operated primarily in the Bronx, trafficked in cocaine, cocaine base ("crack cocaine") and heroin. Its members were involved in many acts of violence, including murders, robberies, kidnappings, and assaults. (Trial Transcript ("Tr.") at 739-81, 807-09, 832-39, 872-

79, 918-22, 1047-79, 1090-1157, 1675-1716) The Government alleged that Calcano was a manager in the Organization, and that she distributed large amounts of crack cocaine on its behalf in Reading, Pennsylvania. (Id. at 38, 42) The Government further alleged that she aided and abetted the shooting of her ex-boyfriend – Roberto Cruz Rodriguez, a/k/a Papo Cabeza – a drug dealer who owed the Organization payment for crack cocaine. (Id. at 26, 27, 35-36)

The case was assigned to the Honorable Robert L. Carter. Calcano first appeared in the Southern District of New York on June 16, 1998, and David Gordon was assigned to represent her at that time. She was released on bail on June 29, 1998. (Dkt. No. 33)

On October 16, 2000, Calcano and two co-defendants proceeded to trial on the seventeenth superseding indictment (United States v. Ramirez, S17 98 Cr. 438 (Dkt. No. 160)), which charged her with committing a violent crime in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3), and with narcotics conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (Id.) The trial lasted eight weeks. Calcano testified, claiming that she (1) was not a member of the Organization, (2) had not sold drugs on its behalf, and (3) had merely asked Juan Ramirez, the Organization's leader, to "talk" to Papo because he had threatened her. (Tr. at 2524, 2527, 2615, 2634-35)

The evidence adduced at trial, however, demonstrated that Calcano had sold crack cocaine for the Organization in Reading, Pennsylvania for several months in 1995. Gang members delivered crack to Calcano in Reading on numerous occasions, often concealing the drugs in Pringles potato chip cans with false bottoms. (Tr. at 409-10, 786, 1693-94) Jesus Salcedo, a member of the Organization, testified that he prepared 125 grams of crack twice a week, for three to four months, for distribution in Reading. (Id. at 785-86) The crack cocaine

was delivered to Calcano and she supervised its sale, which took place primarily in the area of Pear Street in Reading. (Id. at 1126, 1132, 1363, 1373)

In the summer of 1995, Calcano reported to members of the Organization that Papo had not paid for crack cocaine supplied by the Organization. (Id. at 799, 1125-26) Several gang members travelled to Reading on June 27, 1995, to collect the debt. (Id. at 800, 1126, 1129, 1699) After the group arrived in Reading, Calcano told gang leader Juan Ramirez that she "had given some drugs to Papo and Papo had not paid for them." (Id. at 804) Calcano offered to bring the gang members to Papo, but her efforts to locate him were not successful. After returning to Calcano's house, Calcano received a call from Papo, who told her to tell Ramirez to meet him on Pear Street. (Id. at 1702) The group went to Pear Street, where Ramirez planned for co-conspirator Manuel Gonzalez to approach Papo with a gun. (Id. at 1704)

Once they encountered Papo, one gang member grabbed Papo by the neck, while Calcano handed Manuel Gonzalez a gun. Gonzalez used the gun to hit Papo in the head while others kicked him. (Id. at 807-08, 1436, 1703) Someone told Gonzalez to shoot Papo in the leg, and he did so. (Id. at 809) Two bystanders witnessed the assault (id. at 1358-86; 1423-54), and one testified that she saw Calcano hand Gonzalez a gun, and watched Gonzalez shoot Papo in the leg. (Id. at 1436) Papo returned fire after being shot, and Calcano and the others fled in three cars. (Id. at. 1371-72, 1437) Police stopped two of the cars, and arrested all seven passengers, including Calcano. (Id. at 1481-85) After this incident, Calcano continued to sell crack cocaine and heroin in Reading for another gang member. (Id. at 1139-42) Calcano was arrested on June 15, 1998. (PSR at ¶ 103)

On December 7, 2000, the jury returned a guilty verdict on both counts. However, the jury found Calcano liable only for a (b)(1)(B) conspiracy – 5 to 50 grams of crack cocaine – as opposed to a (b)(1)(A) conspiracy. After the verdict, Calcano was remanded.

In contrast to the jury verdict, the Probation Department's Presentence Report ("PSR") found that Calcano was responsible for distributing and possessing with intent to distribute approximately three to four kilograms of crack cocaine. (PSR ¶ 113) Judge Carter adopted this finding at Calcano's January 24, 2002 sentencing hearing. (Sentencing Transcript ("Sent. Tr.") at 50) ("The evidence is from [a cooperating witness], that he cooked 125 grams of crack cocaine twice a week for Ms. Calcano for three to four months, which amounts to three to four kilograms of crack during the relevant period.") Accordingly, the PSR and Judge Carter found that the Defendant's base offense level was 38 under the Guidelines then in effect. (PSR ¶ 127; Sent. Tr. at 50 ("All the objections to the presentence report are overruled."))

The PSR recommended, and Judge Carter imposed, a three-level managerial role enhancement and a two-level dangerous weapon enhancement, thus increasing Calcano's total offense level to 43. (PSR ¶ 128; Sent. Tr. at 51-52) The Probation Department deferred to the sentencing court's judgment as whether an obstruction of justice enhancement was warranted. (PSR ¶ 115) Because Calcano had no criminal history, the Probation Department concluded that she belonged in Criminal History Category I. (Id. at ¶ 148) At offense level 43 and Criminal History Category I, the Guidelines called for life imprisonment. However, because the statutory maximum on the racketeering offense was 240 months, and the statutory maximum on the narcotics conspiracy was 480 months, the Probation Department determined – pursuant to § 5G1.1(a) – that the applicable Guidelines range was 720 months' imprisonment. (Id. at ¶ 195)

4

Calcano made several challenges to the Guidelines calculations in the PSR. (Def Ltr. June 7, 2001; Def. Ltr. Jan. 23, 2002) She also argued that a downward departure was warranted based on (1) extraordinary family circumstances – her mother and father were seriously ill and dependent on her – and (2) the Sentencing Commission's failure to anticipate Apprendi v. New Jersey, 530 U.S. 466 (2000), when promulgating a rule that allows judges to determine drug quantity by a preponderance of the evidence. (Sent. Tr. at 29-30) Judge Carter rejected all challenges to the PSR and Calcano's request for a downward departure. (Id. at 50, 54, 56) Judge Carter further concluded that a two-level enhancement for obstruction of justice should be imposed, because Calcano had committed perjury at trial. (Id. at 52) Accordingly, under Judge Carter's calculations, Calcano's adjusted offense level was 45. The recommended sentence under the Guidelines remained 720 months' imprisonment, however, because of the statutory maximums. (Id. at 53)

Judge Carter did not impose the Guidelines sentence of 720 months, however. At sentencing, Judge Carter asked the Government whether he had the discretion to impose the sentences for each count concurrently rather than consecutively. (Id. at 53) The prosecutor erroneously informed Judge Carter that he had "discretion to give the sentence concurrently." (Id.) Judge Carter then imposed concurrent sentences of 240 months' imprisonment on the racketeering offense and 480 months' imprisonment on the narcotics offense. (Id. at 54) This sentence was in error because, under the then-mandatory Guidelines, Judge Carter did not have discretion to impose concurrent sentences under the circumstances of this case.

Calcano filed a notice of appeal on January 30, 2002. (Dkt. No. 221) In a December 17, 2003 summary order, the Second Circuit affirmed Calcano's conviction.[1] On October 4, 2004, however, the United States Supreme Court vacated the judgment and remanded the case for further consideration in light of Crawford v. Washington, 541 U.S. 36 (2004). See Calcano v. United States, 543 U.S. 801 (2004). On August 15, 2005, in another summary order, the Second Circuit affirmed Calcano's conviction, but concluded that "[i]n light of the Supreme Court's decision in United States v. Booker, [543 U.S. 220] (2005), and this court's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), th[e] case [should be] remanded, as to Calcano's sentence, to the district court for further proceedings in conformity with Crosby." United States v. Ramirez, Nos. 02-1080(L) & 02-1084 (Con) (2d Cir. Aug. 15, 2005) (the "Remand Order" (Dkt. No. 295) at 8). On April 17, 2006, the Supreme Court denied Calcano's petition for a writ of certiorari. Calcano v. United States, 547 U.S. 1083 (2006).

According to the Clerk's Office of the Court of Appeals, no mandate was issued concerning the August 15, 2005 summary order at that time. The district court, of course, has no jurisdiction until after a mandate issues. See United States v. Rivera, 844 F.2d 916, 921 (2d Cir. 1988) ("Simply put, jurisdiction follows the mandate.").

Nothing happened in the district court after the August 2005 summary order was issued. Neither the Government nor defense counsel sought to have Calcano resentenced in light of Crosby.

More than four years later – on November 24, 2009 – this case was transferred from Judge Carter to this Court. (Dkt. No. 318) This Court contacted counsel on January 12, 2010. The prosecutors had left the U.S. Attorney's Office and were at law firms, and appeared

---

[1] United States v. Martinez, 83 F. App'x 384, 385 (2d Cir. 2003) (summary order) cert. granted, judgment vacated sub nom. Calcano v. United States, 543 U.S. 801 (2004)

6

to know nothing about the appellate proceedings. Defense counsel likewise did not indicate that there was anything remaining for this Court to do. After January 12, 2010, this Court heard nothing from either side's counsel.

On November 17, 2011, Calcano moved pro se for a reduction of sentence pursuant to 18 U.S.C. § 3528(c)(2) in light of the 2007 amendments to the Sentencing Guidelines for offenses involving crack cocaine and the Fair Sentencing Act of 2010. (Dkt. No. 340) On November 30, 2011, the Probation Department issued a memorandum to this Court, to Mr. Gordon, and to Janice Sandt of the U.S. Attorney's Office stating that Calcano was not eligible for a reduction in sentence under the 2007 amendments to the Sentencing Guidelines and the Fair Sentencing Act. The Probation Department determined that even after the amendments and the Fair Sentencing Act were taken into account, Calcano's Guidelines range remained the same – 720 months. On March 13, 2012, Calcano sent a letter to the Court asking when her motion would be decided.

In preparing a decision concerning Calcano's pro se petition, this Court learned that there had been a Crosby remand. This Court contacted the Court of Appeals concerning the issuance of a mandate, and the mandate was issued on January 24, 2013. (Dkt. No. 343) This Court also contacted defense counsel and the U.S. Attorney's Office and conducted a conference in this matter on January 24, 2013. (Dkt. No. 341) In preparation for the conference, defense counsel submitted a letter arguing that Calcano should be resentenced and should receive a sentence of time-served. (Def. Ltr. Jan. 16, 2013) In a January 22, 2013 letter, the Government stated that it consented to Calcano being resentenced under Crosby. (Gov't Ltr. Jan. 22, 2013) The Government also stated, somewhat inconsistently, that "while the Government believes that Judge Carter's [40 year] sentence was a reasonable sentence, the Government also agrees with

defense counsel that a re-sentence of time served followed by a mandatory minimum term of supervised release would be a reasonable sentence pursuant to Title 18, United States Code, Section 3553(a)." (Id.) This Court subsequently ordered the parties to submit briefing on three issues: (1) whether resentencing is appropriate; (2) in the event of resentencing, what would be an appropriate sentence; and (3) whether, in determining a new sentence, this Court may consider events that occurred after the original sentencing. (Jan. 24, 2013 Tr. at 9-10)

Calcano now argues that – had the Guidelines been advisory rather than mandatory – this Court "would have imposed a sentence that differed in a nontrivial manner from the one imposed by Judge Carter . . . given Ms. Calcano's background, lack of any prior criminal record, and short and limited involvement with the Ramirez organization." (Def. Br. (Dkt. No. 345) at 10) Defendant also argues that the base offense level – as determined by the Probation Department and Judge Carter – is erroneous, and that the role in the offense and obstruction of justice enhancements are improper. (Id. at 13-22). Finally, defense counsel contends that a sentence of time-served is appropriate given the sentences imposed on Calcano's co-defendants, her age, the period of imprisonment she has already served, and the likelihood that she will commit crimes in the future. (Id. at 25)

The Government asserts that all of Calcano's challenges to the Guidelines calculations have been waived, noting that she did not appeal her sentence. The Government maintains, however, that under Crosby "this Court has the authority to resentence the defendant to a sentence of time served." (Gov't Br. (Dkt. No. 347) at 2) The Government's submission provides scant reasoning as to why resentencing Calcano to time-served would be appropriate. It merely states that "[t]he trial court . . . applied the sentencing guidelines in a mandatory manner, which resulted in a material difference in the defendant's sentence," and that in determining a

new sentence "the court must also consider the history and characteristics of the [D]efendant . . . includ[ing] the [D]efendant's age, 53 years, and the fact that she has been incarcerated for more than thirteen years." (Id. at 12-13)

## DISCUSSION

### I. *CROSBY* STANDARD

Because Calcano did not challenge the application of the Guidelines to her case at sentencing, this remand is governed by Crosby, 397 F.3d 103. In Crosby, the Second Circuit noted that Booker, 543 U.S. 220, renders the Sentencing Guidelines advisory. Crosby, 397 F.3d at 111-12. Accordingly, sentencing courts must merely consider the Guidelines along with the factors set forth in 18 U.S.C. § 3553(a) in arriving at an appropriate sentence. Id. For cases pending on direct appeal before Booker was decided, the Second Circuit held that the proper disposition would "be a remand to the district court, not for the purpose of a required resentencing but only for the more limited purpose of permitting the sentencing judge to determine whether to resentence, now fully informed of the new sentencing regime, and if so, to resentence." Crosby, 397 F.3d at 117 (emphasis in original). Crosby further states that the sentencing court's decision as to whether resentencing is warranted should be "based on the circumstances at the time of the original sentence . . . ." Id. at 120.

In United States v. Garcia, 413 F.3d 201 (2d Cir. 2005), the Second Circuit addressed the procedure to be followed where, as here, the judge who imposed the original sentence is no longer serving, either because of death or retirement. The Garcia court began by considering whether a Crosby remand is even appropriate in such circumstances. The Second Circuit concluded that "it is the District Court as an institution – not simply an individual judge of that court – that is better suited than the Court of Appeals to perform the comparative sentence

9

inquiry necessary to 'complete[]' plain error review." Garcia, 413 F.3d at 226 (quoting United States v. Williams, 399 F.3d 450, 461 (2d Cir. 2005) (quoting Crosby, 397 F.3d at 118)). The court reasoned that:

> [t]he judgment appealed from . . . is that of the district court, not simply that of a particular judge. Thus, the comparative sentence inquiry might properly be viewed as between the court's challenged sentence and the sentence the court would have imposed with a proper understanding of the law. Where the original sentencing judge is no longer available to speak for the district court on the second point, the responsibility for identifying the sentence that the court would have imposed under a correct view of the law may properly be reassigned to another district judge.

Id. at 227-28 (emphasis in original). The Second Circuit also recognized, however, that a successor judge cannot "do the impossible, i.e., determine what sentence the original judge would have imposed on behalf of the court with a correct understanding of the law and a fully developed record." Id. at 228.

The procedure to be followed on a Crosby remand – where the sentencing judge is no longer available – involves three steps. First, the successor court must "consider what sentence [it] would have imposed on behalf of the court with the benefit of Booker and a full record." Id. In making that determination, the court should "carefully consider any statements made by the original sentencing judge indicating an inclination to show greater leniency or severity but for the Guidelines mandates." Id. at n.19. In contrast, "new evidence arising after" sentencing is not to be considered since the "comparative inquiry must be made by reference to the 'facts existing at the time of sentencing[.]'" Id. at 229 (quoting Williams, 399 F.3d at 459 n.8). Second, the successor court "must then determine whether that lawful sentence differs in a more than trivial manner from the one that was actually imposed." Id. at 228. If the answer to that question is yes, the court should proceed to the third step of resentencing the defendant. Id. at 229-30 ("Only if the district judge identifies a more-than-trivial disparity between the

challenged sentence and the sentence that the court would have imposed with the benefit of Booker does the judge proceed to resentence a defendant.").

## II. THE SENTENCE THAT WOULD HAVE BEEN IMPOSED

This Court must consider "what sentence [it] would have imposed . . . with the benefit of Booker and a full record." Id. at 228. The Court need not calculate the precise sentence it would have imposed; all that matters is whether the hypothetical sentence is materially different than the sentence that was actually imposed. Crosby, 397 F.3d at 118 n.20.

Before making that determination here, however, the Court must address two arguments raised by Calcano. First, she contends that, notwithstanding Garcia, this Court may consider evidence of her post-sentencing rehabilitation in deciding whether a resentencing is appropriate. The Government argues that this Court may not consider such evidence unless and until it decides that resentencing is warranted. Second, Calcano raises several challenges to Judge Carter's application of the Sentencing Guidelines. The Government contends that Calcano has waived these arguments, having not challenged her sentence on appeal.

The Court also considers below whether there is any evidence in the record suggesting that Judge Carter would have been inclined to give a more lenient sentence absent the then-mandatory Sentencing Guidelines.

### A. Evidence of Rehabilitation

Relying on Pepper v. United States, __U.S.__, 131 S.Ct. 1229, 1241 (2011) and United States v. Cuevas, 484 F. App'x 642, 644 (2d Cir. 2012), Calcano argues that "[i]t is clear that [this Court] may consider events occurring after the imposition of the original sentence in deciding both whether to re-sentence Ms. Calcano pursuant to the [Crosby] remand . . . , and if so, in determining what re-sentence to impose." (Def. Br. (Dkt. No. 345) at 2)

11

The Second Circuit has "repeatedly held[, however,] that a district court is not to consider . . . evidence [of post-conviction rehabilitation] on a remand under [Crosby]. Rather, on a Crosby remand, a district court must first make a 'threshold determination' of whether, '<u>based on the circumstances at the time of the original sentence</u>,' it would have imposed a different sentence had it known the Guidelines were advisory." United States v. Ferrell, 485 F.3d 687, 688 (2d Cir. 2007) (quoting Crosby, 397 F.3d at 120) (emphasis in Ferrell) (internal citation omitted). Pepper and Cuevas are not to the contrary.

In Pepper, the Supreme Court held that evidence of post-sentencing rehabilitation may be considered by a district court "when resentencing petitioner after his initial sentence had been set aside on appeal." Pepper, 131 S.Ct. at 1236. The remand orders in Pepper, however, were "general remands for resentencing, which did not place any limitations on the discretion of the newly assigned district court judge in resentencing." Id. at 1239 (internal quotation marks and alterations omitted). Moreover, the Supreme Court explicitly noted that its decision was not intended to "preclude courts of appeals from issuing limited remand orders, in appropriate cases, that may render evidence of post-sentencing rehabilitation irrelevant in light of the narrow purposes of the remand proceeding." Id. at 1249 n.17. That is the situation here.

In Cuevas, the Second Circuit upheld, by summary order, a district judge's denial of appellant's motion for resentencing under Crosby. The district judge had considered appellant's post-sentence rehabilitation, but concluded that such rehabilitation did not "materially change what justice required at the time of [appellant's] sentencing, nor what it requires now, which is the sentence previously imposed." Cuevas, 484 F. App'x at 644 (quoting United States v. Cuevas, 98 CR 1053-02 JSR, 2011 WL 5579047, at *2 (S.D.N.Y. Nov. 15, 2011)). In affirming, the panel noted that, on a Crosby remand, "the district court is charged

12

with determining 'whether to resentence,' 'based on the circumstances at the time of the original sentence.'" Id. at 643. Cuevas does not reflect a change in Second Circuit law but is instead consistent with Crosby and Ferrell.

In determining whether resentencing is warranted here, this Court will not consider post-sentence events, including evidence of post-sentence rehabilitation.

### B. Challenges to Judge Carter's Guidelines Calculations

Calcano argues that (1) the base offense level found by the Probation Department and Judge Carter is erroneous because "the evidence presented at trial failed to establish by a preponderance of the evidence that [she] received three or more kilograms of crack" (Def. Br. (Dkt. No. 345) at 13-14); (2) the managerial or supervisory role enhancement was unwarranted, as "there was no trial testimony to support such a determination" (Id. at 15-19); and (3) Judge Carter erred in imposing an obstruction of justice enhancement because there was no "clear and convincing evidence" that Calcano had committed perjury. (Id. at 19-22) The Government contends that Calcano waived these arguments, having never appealed her sentence. (Gov't Br. (Dkt. No. 347) at 8)

Given Calcano's failure to appeal her original sentence, this Court may not revisit Judge Carter's Guidelines calculations. The law of the case doctrine "forecloses reconsideration of issues that were decided – or could have been decided – during prior proceedings." United States v. Williams, 475 F.3d 468, 471 (2d Cir. 2007) ("the law of the case doctrine ordinarily will bar a defendant from renewing challenges to rulings made by the sentencing court that were adjudicated by [the Court of Appeals] – or that could have been adjudicated by [the Court of Appeals] had the defendant made them – during the initial appeal that led to the Crosby remand"). Calcano chose not to raise on appeal the sentencing issues she presents now. Having

13

made this strategic decision (see Def. Br. (Dkt. No. 345) at 7), she may not seek to litigate these issues in this proceeding. See United States v. Quintieri, 306 F.3d 1217, 1229 (2d Cir. 2002) ("The law of the case ordinarily 'forecloses relitigation of issues expressly or impliedly decided by the appellate court.' . . . [It] ordinarily prohibits a party, upon resentencing or an appeal from that resentencing, from raising issues that he or she waived by not litigating them at the time of the initial sentencing.") (alterations in original) (quoting United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001)).

In any event, this Court has reviewed Judge Carter's application of the Guidelines regarding drug amount, role enhancement, and obstruction of justice enhancement, and finds no error.

### C. Inclination Towards Leniency

Before determining whether it would have imposed a materially different sentence, this Court must consider any statements made by Judge Carter at sentencing that evince an inclination to show greater leniency than permitted by the then-mandatory Sentencing Guidelines. Having reviewed the record, this Court concludes that Judge Carter intended to show leniency towards Calcano. The record is ambiguous, however, as to whether Judge Carter felt constrained by the Guidelines.

As noted above, Judge Carter did not impose a Guidelines sentence. A Guidelines sentence here would have been 720 months' imprisonment. In imposing concurrent sentences and a 40 year sentence, it is a fair inference that Judge Carter believed that 720 months' imprisonment was too severe a punishment. There is no indication in the record, however, as to whether he would have imposed an even lower sentence had the Guidelines been advisory.

### D. Resentencing is Warranted

Accepting Judge Carter's Guidelines calculations as accurate, and without considering any evidence of Calcano's post-sentence rehabilitation, this Court nevertheless concludes that it would have imposed a non-trivially different sentence on Calcano had the Guidelines been advisory at the time of her sentence.

Calcano's criminal conduct was extremely serious, and this Court concurs with Judge Carter's finding that Calcano obstructed justice by repeatedly lying at trial about her involvement in criminal activity. However, Calcano was 41 years old and employed at the time of her sentencing, and she had no significant criminal history.[2] During the thirteen-and-a-half months she was on bail prior to trial, Calcano was fully compliant with the terms of her release. Given Calcano's age, the likelihood that she would recidivate – particularly after a lengthy period of incarceration – appears to be low. See United States v. Birkett, 99CR.338-01 (RWS), 2006 WL 2819663, at *4 (S.D.N.Y. Oct. 2, 2006) (noting that courts have "declined to impose Guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases'") (quoting U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines, at 12 (2004)).

Moreover, despite Calcano's managerial role in the Organization, she was not central to its activities, nor did she participate in its violent acts, with the exception of the assault on Papo. Three co-defendants who were sentenced before Calcano, and who admitted to racketeering acts of murder, attempted murder and/or conspiracy to commit murder, received sentences ranging from 240 months' to 420 months' imprisonment, significantly below the 480

---

[2] Calcano's sole conviction was for disorderly conduct – a violation – in 1993. (PSR, ¶¶ 145-48)

month sentence imposed on Calcano.³ While those defendants pled guilty, there is no evidence that they cooperated with the Government. "[I]f sentencing disparities between co-defendants are properly considered, the weight to be given such disparities, like the weight to be given any § 3553(a) factor, 'is a matter firmly committed to the discretion of the sentencing judge and is beyond [appellate] review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented.'" United States v. Florez, 447 F.3d 145, 158 (2d Cir. 2006) (quoting United States v. Fernandez, 443 F.3d 19, 32 (2d Cir. 2006)). Here, the need to avoid unwarranted sentencing disparities counsels in favor of a non-Guidelines sentence.

Under these circumstances, this Court concludes that it would have imposed a non-trivially different sentence on Calcano had the Guidelines been advisory at the time of her sentencing.

## CONCLUSION

For the reasons stated above, Defendant Shirley Calcano's motion for resentencing is granted.

Dated: New York, New York
January 15, 2014

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

³ See Judgment as to Manuel Gonzalez (Dkt. No. 141) (420 months' imprisonment) (Gonzalez participated in a variety of racketeering activities, including acts of violence, narcotics trafficking, and car theft. Gonzalez murdered Francisco Soto and Felix Rodriguez, and shot Papo Cabeza.); Judgment as to Julio Castillo (Dkt. No. 191) (240 months' imprisonment) (Castillo, posing as a police officer, persuaded Soto to exit his vehicle. Soto was then kidnapped and transported to the Bronx, where he was executed.); Judgment as to Albert Colon (Dkt. No. 207) (240 months' imprisonment) (Colon was present for the Soto murder, and drove the getaway car.).